# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with account identified as cellular telephone number (859) 429-7551, with username: "lekan20083" and email address: "lekan200@gmail.com," that is within the possession, custody, or control of TEXTNOW INC. | )<br>)<br>)<br>)<br>)<br>)<br>Case No. 2:20-MJ-00905 |

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;
☑ Contraband, fruits of crime, or other items illegally possessed;
☑ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code section(s) | Offense Description |
|---|---|
| 18 U.S.C. § 875(c) | Threats by interstate communication |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

<table>
<tr><td></td><td>Applicant's signature</td></tr>
<tr><td></td><td>Uriel I. Acosta, Special Agent</td></tr>
<tr><td></td><td>Printed name and title</td></tr>
</table>

Sworn to before me and signed in my presence:

Date: _____

City and State: <u>Santa Barbara, California</u>

<table>
<tr><td></td></tr>
<tr><td><i>Judge's signature</i></td></tr>
<tr><td>Louise A. LaMothe, U.S. Magistrate Judge</td></tr>
<tr><td><i>Printed name and title</i></td></tr>
</table>

AUSA: Brian R. Faerstein (213-894-3819)

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the cellular telephone number and account identified below (the "SUBJECT ACCOUNT") that is within the possession, custody, or control of TEXTNOW INC., a company that accepts service of legal process at 420 Wes Graham Way, 2nd Floor, Waterloo, ON N2L 0J6, c/o Corporation Services Company (CSC), 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833-3505, regardless of where such information is stored, held, or maintained.

**SUBJECT ACCOUNT**

1.  Cellular telephone number (859) 429-7551, assigned from February 21, 2020, at approximately 22:29:27 UTC, to February 26, 2020, at approximately 16:05:23 UTC, with username: "lekan20083" and email address: "lekan200@gmail.com."

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

## I.    SEARCH PROCEDURES

1.    The warrant will be presented to personnel of TextNow Inc. (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.10.a below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.  The review of the electronic data may

i

be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5. If the search team encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

6. The search team will complete its search of the content records as soon as is practicable but not to exceed 120 days from the date of receipt from the PROVIDER of the response to this warrant. The government will not search the content records beyond this 120-day period without first obtaining an extension of time order from the Court.

7. Once the search team has completed its review of the content records and created copies of the items seized pursuant to the warrant, the original production from the PROVIDER will be sealed -- and preserved by the search team for authenticity and chain of custody purposes -- until further order of the Court. Thereafter, the search team will not access the data

from the sealed original production which fell outside the scope
of the items to be seized absent further order of the Court.

8.     The special procedures relating to digital data found
in this warrant govern only the search of digital data pursuant
to the authority conferred by this warrant and do not apply to
any search of digital data pursuant to any other court order.

9.     Pursuant to 18 U.S.C. § 2703(g) the presence of an
agent is not required for service or execution of this warrant.

## II.   INFORMATION TO BE DISCLOSED BY THE PROVIDER

10.     To the extent that the information described in
Attachment A is within the possession, custody, or control of
the PROVIDER, regardless of whether such information is located
within or outside of the United States, including any
information that has been deleted but is still available to the
PROVIDER, or has been preserved pursuant to a request made under
18 U.S.C. § 2703(f), the PROVIDER is required to disclose the
following information to the government for the SUBJECT ACCOUNT
described in Attachment A:

a.     All contents of all wire and electronic
communications associated with the SUBJECT ACCOUNT, limited to
that which occurred on or after February 21, 2020,[1] including:

i.     All text messages, e-mails, voicemail

---

[1] To the extent it is not reasonably feasible for the
PROVIDER to restrict any categories of records based on this
date restriction (for example, because a date filter is not
available for such data), the PROVIDER shall disclose those
records in its possession at the time the warrant is served upon
it.

messages, communications, or messages of any kind associated with the SUBJECT ACCOUNT, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments;

   ii. All records or other information stored by subscriber(s) of the SUBJECT ACCOUNT, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files; and

   iii. All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNT, including contacts with support services and records of actions taken.

   b. All other records and information, including:

   i. All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers, or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment,

including detailed billing records, **and including any changes made to any subscriber information** or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)     The SUBJECT ACCOUNT;

(II)    Any other account associated with the SUBJECT ACCOUNT, including by means of sharing a common secondary, recovery, or alternate **e-mail address listed in subscriber records** for the SUBJECT ACCOUNT or by means of sharing a **common phone number or SMS number listed in subscriber records** for the SUBJECT ACCOUNT, and any account that lists the SUBJECT ACCOUNT as a secondary, recovery, or alternate email address;

(III)   Any other account accessed by a device with an identifier responsive to the device identifiers called for in paragraph 10.b.iii, below; and

(IV)    Any other account associated with the cookie(s) associated with the SUBJECT ACCOUNT.

ii.    All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNT described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made;

iii.    Any information identifying the device or
devices used to access the SUBJECT ACCOUNT, including any
Android ID, Advertising ID, unique application number, hardware
model, operating system version, unique device identifier,
Global Unique Identifier or "GUID," serial number, mobile
network information, phone number, device serial number, MAC
address, Electronic Serial Number ("ESN"), Mobile Electronic
Identity Number ("MEIN"), Mobile Equipment Identifier ("MEID"),
Mobile Identification Number ("MIN"), Subscriber Identity Module
("SIM"), Mobile Subscriber Integrated Services Digital Network
Number ("MSISDN"), International Mobile Subscriber Identifier
("IMSI"), International Mobile Equipment Identity ("IMEI"), or
Apple advertiser ID or ID for advertisers ("IDFA"), or Google's
AAID or any other advertiser ID, and any other information
regarding the types of devices used to access the SUBJECT
ACCOUNT or other device-specific information, including the
device type, brand name, device mode or operating system, and
first and last times that a device were observed;

iv.    Any information showing the location of
the user of the SUBJECT ACCOUNT, including while sending or
receiving a message using the SUBJECT ACCOUNT or accessing or
logged into the SUBJECT ACCOUNT; and

v.    Any and all cookies used by any computer
or web browser associated with the SUBJECT ACCOUNT, including
the IP addresses, dates, and times associated with the
recognition of any such cookie.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

11.  For the SUBJECT ACCOUNT described in Attachment A, the search team may seize:

a.   All information described above in Section II.10.a. that constitutes evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 875(c) (threats by interstate communication), namely:

i.      Information relating to who created, accessed, or used the SUBJECT ACCOUNT, including records about their identities and whereabouts.

ii.      Information relating to the production or dissemination of threatening communications, including threats regarding homicide, murder-for-hire, extortion, or other threats of violence.

iii.      Information relating to individuals producing or disseminating threatening communicatoins, including individuals associated with the username "lekan20038" and email address "lekan200@gmail.com."

iv.      Information relating to victims of threatening communications.

v.     Information relating to the selection, acquisition, possession, or use of other accounts or platforms, including other phone numbers, email addresses, telecommunication accounts, or social media accounts, to produce or dissemenate threatening communications.

vi.      Information relating to the selection and targeting of victims of threatening communications.

vii

vii.    Information relating to encrypting, attempting to encrypt, or otherwise disguising the use of means of communications to produce or disseminate threatening communications.

viii.    Information relating to the identity and/or location of co-conspirators in the production or dissemination of threatening communications.

ix.    Information reflecting communications between the SUBJECT ACCOUNT and other potential co-conspirators in the production or dissemination of threatening communications.

b.    All records and information described above in Section II.10.b.

## IV.    PROVIDER PROCEDURES

12.    IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

> Special Agent Uriel I. Acosta
> FEDERAL BUREAU OF INVESTIGATION
> 600 East Plaza Drive
> Santa Maria, California 93454
> Los Angeles Field Office
> Telephone:  (310) 270-6207
> Facsimile:  (805) 364-3315
> E-mail:    uacosta@fbi.gov

13.    IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant.

14.    IT IS FURTHER ORDERED, pursuant to 18 U.S.C § 2705(b),

that the PROVIDER shall not notify any person, including the
subscriber(s) of the SUBJECT ACCOUNT identified in Attachment A,
of the existence of the warrant, until further order of the
Court, until written notice is provided by the United States
Attorney's Office that nondisclosure is no longer required, or
until one year from the date this warrant is signed by the
magistrate judge or such later date as may be set by the Court
upon application for an extension by the United States.   Upon
expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified in paragraph 12 above of its intent
to so notify.

**AFFIDAVIT**

I, URIEL I. ACOSTA, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent with the Federal Bureau of
Investigation ("FBI"), and have been so employed since May 2018.
I am currently assigned to the Santa Maria, California Resident
Agency, which is part of the Los Angeles Field Office of the
FBI.  Since graduating from the FBI Academy, my experience as an
FBI agent includes conducting physical surveillance, debriefing
informants, and interviewing witnesses, subjects, and victims of
crimes, as well as executing search and arrest warrants.  I have
conducted searches and analysis of Internet Protocol (IP)
addresses to further investigations, and I have coordinated and
collaborated with other law enforcement officers and agencies in
ongoing investigations.

2.   Prior to becoming a Special Agent with the FBI, I
worked for four years as a Special Agent with the Drug
Enforcement Administration ("DEA") in El Paso, Texas.  As a DEA
Special Agent, my experience included coordinating and leading
drug-related operations.  I earned a bachelor's degree in
Business Administration with Majors in Economics and
International Business in May 2006 from New Mexico State
University.

3.   In addition, I have received both formal and informal
training from the FBI and other institutions regarding cyber-
related investigations and computer technology.  In connection

with my work on the investigation described herein, I have consulted with other FBI agents and an FBI Computer Scientist with training and experience in investigations of computer, cyber, and high-technology crimes, including computer intrusions, access device fraud, and other types of malicious computer activity.

4.    I make this affidavit in support of an application for a warrant for information that is stored at premises controlled by TextNow Inc. ("TextNow" or the "PROVIDER"), a provider of electronic communication and remote computing services, headquartered at 420 Wes Graham Way, 2nd Floor, Waterloo, ON N2L 0J6, c/o Corporation Services Company (CSC), 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833-3505,[1] associated with the following TextNow phone number and account:

a.    Cellular telephone number (859) 429-7551, assigned from February 21, 2020, at approximately 22:29:27 UTC, to February 26, 2020, at approximately 16:05:23 UTC, username:

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

"lekan20083" and email address: "lekan200@gmail.com" ("**SUBJECT ACCOUNT**").

5.   The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section II of Attachment B.  Upon receipt of the information described in Section II of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section III of Attachment B.  Attachments A and B are incorporated herein by reference.

6.   As described more fully below, I respectfully submit there is probable cause to believe that the information associated with the SUBJECT ACCOUNT constitutes evidence,

---

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

contraband, fruits, or instrumentalities of criminal violations of federal law, including violations of 18 U.S.C. § 875(c) (threats by interstate communication) (the "Subject Offenses").

7. The facts set forth in this affidavit are based upon my personal observations, my training and experience, my consultations with other law enforcement investigators with training and experience in investigating computer, cyber, and high-technology crimes, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### SUMMARY OF PROBABLE CAUSE

8. The FBI is currently investigating a murder-for-hire death threat that was sent via text message to a victim (the "Victim") in San Luis Obispo County, California on February 21, 2020. The Victim did not recognize the phone number associated with the text message nor did the Victim know who sent the text message. The FBI ultimately determined that the phone number was registered to TextNow. The FBI further determined that, at the time the text message threat was sent, the phone number was being used by a user identified as "lekan20083," i.e., the SUBJECT ACCOUNT. Through this search warrant application, the FBI seeks to obtain additional information about the SUBJECT

4

ACCOUNT in connection with the FBI's investigation of the Subject Offenses.

## BACKGROUND REGARDING TEXTNOW

9.   Based on my training and experience, discussions with other law enforcement investigators with knowledge about computer, cyber, and high-technology crimes, and my review of publicly-available information, I have learned the following regarding TextNow:

a.   TextNow is a telecommunications service application similar to Skype that allows a user to send text messages and make telephone calls over the Internet.  Among other things, TextNow uses Voice-over Internet Protocol, or "VoIP," to allow users to make calls and send text messages from telephone numbers obtained from TextNow.  In certain cases, TextNow provides these temporary telephone numbers for free, and individuals can easily and frequently change the telephone number on their account.  As a result, TextNow telephone numbers may be assigned to accounts for limited duration.[3]  As noted below, because TextNow provides temporary telephone numbers for free, individuals can create and use those telephone numbers when communicating with and targeting victims while hiding their true identities.

---

[3] For this reason, the date and time ranges listed in this warrant application reflect the date and time ranges that the relevant phone number was assigned to the SUBJECT ACCOUNT.

## IV.   STATEMENT OF PROBABLE CAUSE

### A.   Initial Report of Threat-to-Life Text Message Received February 21, 2020

10.   On February 21, 2020, at approximately 2:41 p.m. PST (22:41 UTC), the Victim received a text message from the SUBJECT ACCOUNT.  The Victim, who resides in San Luis Obispo County, California, did not recognize the telephone number of the SUBJECT ACCOUNT, which is a telephone number with an area code based in Kentucky.

11.   The text message stated as follows:  "I am very sorry for you [Victim's last name], is a pity that this is how your life is going to end soon as you don't comply. As you can see there is no need of introducing myself to you because I don't have any business with you. My duty as I am mailing you now is to KILL you and I have to do it as I have already been paid for that."  The Victim did not know who was sending him/her the text message.

12.   Shortly after receiving the text message on February 21, 2020, the Victim reported the incident to the Grover Beach Police Department (the "GBPD").  As part of its investigation, the GBPD's responding officer called the SUBJECT ACCOUNT and left a voicemail informing the user of the SUBJECT ACCOUNT that law enforcement was investigating a text message sent from the SUBJECT ACCOUNT's phone number.

13.   In response, later the same day, the user of the SUBJECT ACCOUNT sent the GBPD responding officer the following text message:  "I called my client back and ask him to give me

your email address which I didn't tell him what I wanted to do with it and he gave it to me and I am using it to contact you know [sic]. As I am writing you now my men are monitoring you and they are telling me everything about you."

14.     On the same date, the Victim called the FBI's Crisis Management and Operations Center located in Los Angeles, California, and filed a complaint, which was deemed as being a threat-to-life.  Thereafter, I began investigating the incident for potential violations of the Subject Offenses.

## B.   FBI Determines the SUBJECT ACCOUNT is Registered to TextNow and Obtains Initial Information from TextNow

15.     On February 22, 2020, I queried telephone number (859) 429-7551 (the telephone number of the SUBJECT ACCOUNT) through FBI indices and open-source databases, which indicated that this telephone number was being serviced by Bandwidth.com. Subsequently, I contacted a representative of Bandwidth.com and learned that the above-referenced telephone number was a VoIP telephone number assigned to TextNow.

16.     On the same date, I submitted an Emergency Disclosure Request to TextNow, inquiring about the above-referenced telephone number.  In light of the exigency of the threat, TextNow provided the FBI with information about several Internet Protocol ("IP") addresses utilized by the SUBJECT ACCOUNT's telephone number between February 21 and February 22, 2020. This list of IP addresses included the IP address that was used by the SUBJECT ACCOUNT at approximately 2:41 p.m. PST (22:41

UTC) on February 21, 2020, the time that the threat-to-life text message was received by the Victim.

17.   TextNow also provided the FBI with basic subscriber information for the SUBJECT ACCOUNT, including the username (lekan20083) and email address (lekan200@gmail.com) to which the SUBJECT ACCOUNT was registered at the time of the threat-to-life text message.  However, I understand from reviewing TextNow's "Guide for Law Enforcement" (the "LE Guide") that subscriber information is submitted by users and TextNow does not verify or authenticate email addresses or first and last name information.

18.   TextNow further provided information reflecting the date and time that the user of the SUBJECT ACCOUNT had registered for the phone number (859) 429-7551.  Specifically, TextNow's records reflect that the user of the SUBJECT ACCOUNT obtained this phone number at approximately 2:29 p.m. PST (22:29:27 UTC), or approximately twelve minutes before the threat-to-life text message was received by the Victim.

19.   According to information received from TextNow, the user of the SUBJECT ACCOUNT ceased using phone number (859) 429-7551 on February 26, 2020, at approximately 8:05 a.m. PST (16:05:23 UTC).

C.   **FBI Communicates Further with TextNow About Additional Potentially Available Information**

20.   Based on my training and experience and my recent communications with TextNow, I know that because TextNow provides temporary telephone numbers for free, individuals can

create and use those telephone numbers when communicating with victims while hiding their true identities. Because TextNow maintains those communications with victims, I believe its records may contain, among other things, evidence of online criminal activity, the true identities of the user(s) of the SUBJECT ACCOUNT, and the identity of any other victims.

21. To that end, on February 25, 2020, I inquired with TextNow as to what other types of information could be obtained about a user account through submission of legal process. In response, a TextNow representative sent me TextNow's LE Guide, which reflects numerous categories of information that TextNow collects and retains through its platform. Among other things, the LE Guide reflects that law enforcement can obtain various types of subscriber data, phone ownership information, message logs and text message content, call logs, voicemail content, IP logs, and different forms of media associated with a specific user account.

22. On February 25 and February 26, 2020, I sent TextNow preservation letters from the U.S. Attorney's Office for the Central District of California requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).[4]

---

[4] In the first letter dated February 25, 2020, the government sought preservation of all data collected and maintained regarding the SUBJECT ACCOUNT from February 20 through February 22, 2020. Upon learning that the SUBJECT ACCOUNT may have still been in use by the same user until February 26, 2020, the government submitted a supplemental preservation letter seeking preservation of all data collected and maintained regarding the SUBJECT ACCOUNT through February

23.   Other than what has been described herein, to my
knowledge the United States has not attempted to obtain the
contents of the SUBJECT ACCOUNT by other means.

## V.   BACKGROUND ON E-MAIL AND SOCIAL MEDIA ACCOUNTS AND THE PROVIDER

24.   In my training and experience,[5] I have learned that
providers of e-mail and/or social media services offer a variety
of online services to the public.   Providers, like the PROVIDER,
allow subscribers to obtain accounts like the SUBJECT ACCOUNT.
Subscribers obtain an account by registering with the provider.
During the registration process, providers generally ask their
subscribers to provide certain personal identifying information
when registering for an e-mail or social media account.   Such
information can include the subscriber's full name, physical
address, telephone numbers and other identifiers, alternative
e-mail addresses, and, for paying subscribers, means and source
of payment (including any credit or bank account number).   Some
providers also maintain a record of changes that are made to the
information provided in subscriber records, such as to any other
e-mail addresses or phone numbers supplied in subscriber
records.   In my training and experience, such information may
constitute evidence of the crimes under investigation because

26, 2020.   In addition, the government sought the preservation
of all data collected and maintained regarding any other TextNow
phone numbers used by the same username and/or email address
that had been associated with the SUBJECT ACCOUNT.

[5] All references to my training and experience herein
include my discussions and consultations with other law
enforcement investigators with specialized knowledge about
computer, cyber, and high-technology crimes.

the information can be used to identify the user(s) of an account.

25. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

26. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

27. In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other

log files that reflect usage of the account.  In addition,
e-mail and social media providers often have records of the
Internet Protocol ("IP") address used to register the account
and the IP addresses associated with particular logins to the
account.  Because every device that connects to the Internet
must use an IP address, IP address information can help to
identify which computers or other devices were used to access a
SUBJECT ACCOUNT.

28.  In my training and experience, e-mail and social media
account users will sometimes communicate directly with the
service provider about issues relating to the account, such as
technical problems, billing inquiries, or complaints from other
users.  Providers of e-mails and social media services typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of a SUBJECT ACCOUNT.

29.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be

12

created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

30. Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNT. If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

13

31.   I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.   They can also discuss aspects of the crime without specifically mentioning the crime involved.   In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.   "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

32.   I have also learned that providers of e-mail and social media services often track the behavior and activities of persons using accounts by using cookies, which are strings of characters and numbers stored on a person's computer on their web browser.   These cookies can often show whether more than one account was accessed by the same computer (and specifically the same web browser), as the provider can recognize that cookie

when the same device returns to the service to access an account.

33.     In order to identify other accounts used or maintained by the user of the SUBJECT ACCOUNT, the warrant also calls for the PROVIDER to disclose both (1) any cookies associated with the SUBJECT ACCOUNT, i.e., those cookies that were placed on any computers or web browsers (for example, Internet Explorer or Google Chrome) used to access the SUBJECT ACCOUNT, and (2) the identity of any other account in which the same cookie or cookies used to access the SUBJECT ACCOUNT was/were recognized. If in the course of the investigation the digital devices used by the subject(s) of the investigation are found, they can be searched to determine if the cookies recognized by the provider are stored on those devices.  The warrant also calls for the PROVIDER to identify any other accounts accessed by any computer or web browser using the same cookies as the SUBJECT ACCOUNT by providing subscriber records and log-in information for those other accounts (but not to provide the contents of communications in those other accounts).

34.     Users of accounts are often required to include an e-mail account as well as a phone number in subscriber records. The e-mail account may be an e-mail account hosted at the same provider, or an account at a different provider.  The e-mail account is referred to by a number of names, such as a secondary e-mail account, a recovery e-mail account, or an alternative e-mail account or communication channel.  That e-mail account is often used when the identity of the user of the primary account

15

(here, the SUBJECT ACCOUNT) needs to be verified, for example if a password is forgotten, so that the provider can confirm that the person trying to access the account is the authorized user of the account.  Similarly, the telephone number used in subscriber records is often used to send a passcode via text (or "SMS") that must be presented when trying to gain access to an account, either in a similar scenario where a user forgot his or her password, or when users implement what is referred to as "two-factor authentication" (where the password is one factor, and the passcode sent via text message to a mobile device is a second).  In either scenario, the user of a primary e-mail account (the SUBJECT ACCOUNT) and a secondary e-mail account or phone number listed in subscriber records are very often the same person, or at least are close and trusted and/or working in concert.  That is because access to either the secondary e-mail account or to the phone number listed in subscriber records can allow access to the primary account.

35.  Providers also frequently obtain information about the types of devices that are used to access accounts like the SUBJECT ACCOUNT.  Those devices can be laptop or desktop computers, cellular phones, tablet computers, or other devices. Individual computers or devices are identified by a number of different means, some of which are assigned to a particular device by a manufacturer and connected to the "hardware" or the physical device, some are assigned by a cellular telephone carrier to a particular account using cellular data or voice services, and some are actually assigned by the provider to keep

16

track of the devices using its services. Those device
identifiers include Android IDs, Advertising IDs, unique
application numbers, hardware models, operating system versions,
unique device identifiers, Global Unique Identifiers or "GUIDs,"
serial numbers, mobile network information, phone numbers,
device serial numbers, Media Access Control ("MAC") addresses,
Electronic Serial Numbers ("ESN"), Mobile Electronic Identity
Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile
Identification Numbers ("MIN"), Subscriber Identity Modules
("SIM"), Mobile Subscriber Integrated Services Digital Network
Numbers ("MSISDN"), International Mobile Subscriber Identifiers
("IMSI"), or International Mobile Equipment Identities ("IMEI").
Apple, one of the primary suppliers of mobile devices used to
access accounts like the SUBJECT ACCOUNT, had previously used an
identifier that was unique to the hardware of its devices, such
that details of a device's activity obtained from a particular
application or "app" could be used to target advertisements for
the user of that device. Apple replaced that hardware-based
identifier with the Apple advertiser ID or IDFA that is still
unique to a particular device, but which can be wiped and re-
generated anew by a user if a user chooses to do so. Most
users, however, do not know that the IDFA exists, and therefore
are unaware that their device's activity can be correlated
across different apps or services. Google uses a similar
advertiser ID referred to as an AAID.

36. These device identifiers can then be used (a) to
identify accounts accessed at other providers by that same

device, and (b) to determine whether any physical devices found in the course of the investigation were the ones used to access the SUBJECT ACCOUNT.   The requested warrant therefore asks for the device identifiers, as well as the identity of any other account accessed by a device with the same identifier.

37.   Providers of e-mail and social media often maintain, have access to, and store information related to the location of the users of accounts they service.   That information may be obtained by the provider in a number of ways.   For example, a user may access the provider's services by running an application on the user's phone or mobile device, which application has access to the location information residing on the phone or mobile device, such as Global Positioning System (GPS) information.   It may also be accessible through "check-in" features that some providers offer that allow users to transmit or display their location to their "friends" or "acquaintances" via the provider.

38.   This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

39.   As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case

is completed through disposition, trial, appeal, or collateral proceeding.

a.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from a SUBJECT ACCOUNT.

b.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

## VI.  REQUEST FOR NON-DISCLOSURE

40.  Pursuant to 18 U.S.C. § 2705(b), I request that the Court enter an order commanding the PROVIDER not to notify any person, including the subscriber(s) of the SUBJECT ACCOUNT, of the existence of the warrant until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date the requested warrant is signed by the magistrate judge, or such later date as may be set by the Court upon application for an extension by the United States.  There is reason to believe that such notification will result in: (1) flight from prosecution; (2) destruction of or tampering with evidence; or (3) otherwise seriously jeopardizing the investigation.

41.  Among other things, the current investigation set forth above, involving threats through interstate communications, is not public, and I know, based on my training and experience, that individuals committing cyber-enabled crime will frequently destroy digital evidence if such individuals learn of an investigation.  In addition, if the PROVIDER or other person notifies the targets of the investigation that a warrant has been issued for the SUBJECT ACCOUNT, the unidentified subjects might further mask their activity and seriously jeopardize the investigation.  Furthermore, the search warrant application sets forth detailed information about the status of the investigation, which, if revealed, would compromise the ongoing investigation.  For example, users of any

accounts involved in this investigation may cease using those accounts and begin using other accounts or aliases in connection with their illicit activities.

### VII. CONCLUSION

42.   Based on the foregoing, I request that the Court issue the requested warrant.   The government will execute this warrant by serving the warrant on the PROVIDER.   Because the warrant will be served on the PROVIDER, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.


_____
URIEL I. ACOSTA, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
on February __, 2020.


_____
HONORABLE LOUISE A. LAMOTHE
UNITED STATES MAGISTRATE JUDGE